Joseph DeJAMES, Appellant,

v.

MAGNIFICENCE CARRIERS, INC., Venture Shipping (Managers Ltd.), Nippon Yusen Kaisha, Hitachi Shipbuilding and Engineering Company, Ltd., and Usuki Tekkosho

Hitachi Shipbuilding and Engineering Company, Ltd., Appellee.

No. 80–2209.

United States Court of Appeals, Third Circuit.

Argued March 19, 1981.

Decided July 9, 1981.

Rehearing Denied July 23, 1981.

Stanley B. Gruber (argued), Camden, N. J., for appellant.

M. Jefferson Davis (argued), Reiners & Davis, Haddonfield, N. J., for appellee; Christopher S. D'Angelo, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel.

Before SEITZ, Chief Judge, and VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Joseph DeJames appeals from an order of the district court dismissing his admiralty claim against Hitachi Shipbuilding and Engineering Co., Ltd. (Hitachi) for lack of personal jurisdiction and insufficient service of process. Although the complaint was not dismissed as to all defendants, the district court determined that there was no just reason for delay and entered final judgment for Hitachi pursuant to rule 54(b) of the Federal Rules of Civil Procedure. The district court had admiralty jurisdiction pursuant to 28 U.S.C. § 1333 (1976). This court has jurisdiction under 28 U.S.C. § 1291 (1976).

I.

DeJames, a New Jersey longshoreman, was injured while working on the M.V. Magnificence Venture (the vessel) when it was moored to a pier in Camden, New Jersey. DeJames filed a complaint in the United States District Court for the District of New Jersey, alleging negligence and strict liability in tort against, *inter alia*, the charterers of the vessel and Hitachi, a Japa-

nese corporation with its principal place of business in Japan. Hitachi had converted the vessel in Japan from a bulk carrier to an automobile carrier. DeJames alleged that Hitachi's conversion work was defective.

After the complaint was filed, process was served on Hitachi at its place of business in Japan by the Japanese Minister of Foreign Affairs apparently in accordance with the requirements of an international treaty. *See Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 20 U.S.T. 361–367 (1969). Hitachi filed a motion to dismiss for lack of personal jurisdiction pursuant to rule 12(b)(2) of the Federal Rules of Civil Procedure. In support of this motion, Hitachi submitted an affidavit from Kiyoshi Ohno, the manager of its ship repair business department in Tokyo, Japan. According to this affidavit, Hitachi completed all work on the vessel at its Japanese shipyard and had no further contact with the vessel after it left Osaka, Japan. The affidavit also states that Hitachi does not maintain an office, have an agent of any type, or transact any business in New Jersey.

After completion of discovery, briefing, and oral argument on the question of jurisdiction, the district court dismissed the complaint against Hitachi. The district court held that there were insufficient contacts with the state of New Jersey to support in personam jurisdiction. *See DeJames v. Magnificence Carriers, Inc.*, 491 F.Supp. 1276, 1279–81 (D.N.J.1980). The court then considered whether it would be appropriate to aggregate all of Hitachi's contacts with the United States for the purpose of establishing personal jurisdiction. The district court believed that a defendant's national contacts might be a viable basis for jurisdiction where service could be effected through wholly federal means. *See id.* at 1284. However, because Congress has not authorized nationwide service of process for admiralty actions, and because it was necessary for DeJames to utilize New Jersey's long-arm rule, the court concluded that the jurisdictional inquiry was limited to the question whether Hitachi's contacts with New Jersey were sufficient to confer personal jurisdiction. *See id.*

On appeal, DeJames makes two arguments for reversing the district court. First, he argues that Hitachi's contacts with the state of New Jersey are sufficient to support personal jurisdiction. Alternatively, he argues for the first time on appeal that service was made by wholly federal means, and thus that the district court erred in not considering Hitachi's national contacts.

## II.

■ Because this suit arises under the district court's admiralty jurisdiction, the due process clause of the fifth amendment determines whether the district court has personal jurisdiction over Hitachi. *See Fraley v. Chesapeake & Ohio Railway*, 397 F.2d 1, 4 (3d Cir. 1968). However, the principle announced in diversity cases such as *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny is also applicable to nondiversity cases. *See Fraley*, 397 F.2d at 3. This standard provides that a defendant is subject to a forum's jurisdiction only if its contacts with the forum are such that maintenance of the suit will not offend traditional notions of fair play and substantial justice. It is unclear whether the *Fraley* court meant that the fifth amendment requires a defendant to have minimum contacts with the forum state, or whether the court intended only that the *International Shoe* test be applied by analogy, so that a defendant need only have minimum contacts with the United States as a whole. In any event, even in nondiversity cases, if service of process must be made pursuant to a state long-arm statute or rule of court, the defendant's amenability to suit in federal district court is limited by that statute or rule. *See Hartley v. Sioux City & New Orleans Barge Lines, Inc.*, 379 F.2d 354, 357 (3d Cir. 1967).

With these principles in mind, we will examine DeJames' arguments that the dis-

trict court erred in dismissing his claim against Hitachi for lack of personal jurisdiction. In the district court, DeJames claimed that service had been made pursuant to New Jersey Court Rule 4:4–4. Although he now claims alternatively that service was made by wholly federal means, we address first his argument that Hitachi's contacts with the state of New Jersey alone are sufficient to support personal jurisdiction under that state's long-arm rule.

## A.

The New Jersey long-arm rule is intended to extend as far as is constitutionally permissible. In enacting its long-arm rule, the state of New Jersey is limited by the due process constraints of the fourteenth amendment. Therefore, we believe that Hitachi's amenability to suit in the District of New Jersey must be judged by fourteenth amendment standards. We recognize that this creates an anomalous situation because it results in a federal court in a nondiversity case being limited by the due process restrictions imposed on the states by the fourteenth amendment as opposed to those imposed on the federal government by the fifth amendment. However, it would be equally anomalous to utilize a state long-arm rule to authorize service of process on a defendant in a manner that the state body enacting the rule could not constitutionally authorize. The anomaly of a federal court being limited by the requirements of the fourteenth amendment in a nondiversity case where service must be made pursuant to a state long-arm rule could be easily rectified by congressional authorization of nationwide service of process for admiralty cases. It is not within our province to create such authorization.

DeJames directs our attention to only one contact that Hitachi has had with the state of New Jersey: the vessel on which Hitachi had done conversion work was docked in Camden, New Jersey when DeJames was injured.[1] DeJames argues that this contact is sufficient to support the exercise of in personam jurisdiction over Hitachi.

The evolution of the due process standards that guide courts in determining whether a defendant is amenable to suit in a particular forum has been detailed on numerous occasions and need not be repeated at length here. The primary consideration in the jurisdictional inquiry is that of fundamental fairness to the defendant. The Supreme Court held in *International Shoe* :

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). In *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), the Supreme Court further refined its due process analysis by stating that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Recently, in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), and *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Supreme Court indicated that due process requires that the defendant have a reasonable expectation that the nature of its conduct is such that it may be "haled before a court" in the forum state. Standing alone, the fact that the defendant could foresee that its conduct might affect the forum state, or that its product might

---

1. In his appellate brief, DeJames refers to contacts that a subsidiary of Hitachi has with the state of New Jersey. However, counsel for DeJames expressly abandoned reliance on the subsidiary's contacts at oral argument before the district court, and we will not consider them on appeal.

find its way to the forum state, is too attenuated to constitute such a "reasonable expectation." *See World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

DeJames argues that the conversion work done by Hitachi on the vessel in effect makes Hitachi the "manufacturer" of the vessel, and thus distinguishes Hitachi from the local retailer and the regional distributor in *World-Wide Volkswagen*. Because Hitachi "manufactured" a ship capable of transporting automobiles, DeJames asserts that Hitachi should be amenable to process in any port where the ship docks and injury occurs as a result of Hitachi's allegedly defective work.

In making this argument, DeJames places substantial reliance on the numerous cases adopting the "stream-of-commerce" theory as a basis for jurisdiction over a foreign manufacturer. *See, e. g., Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200 (D.C.Cir. 1981); *Duple Motor Bodies, Ltd. v. Hollingsworth*, 417 F.2d 231 (9th Cir. 1969).[2] We believe this reliance is misplaced.

■ The stream-of-commerce theory developed as a means of sustaining jurisdiction in products liability cases in which the product had traveled through an extensive chain of distribution before reaching the ultimate consumer. Under this theory, a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes. Courts have found the assumption of jurisdiction in these cases to be consistent with the due process requirements identified above: by increasing the distribution of its products through indirect sales within the forum, a manufacturer benefits legally from the protection provided by the laws of the forum state for its products, as well as economically from indirect sales to forum residents. Underlying the assumption of

jurisdiction in these cases is the belief that the fairness requirements of due process do not extend so far as to permit a manufacturer to insulate itself from the reach of the forum state's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products. *See Note, supra* note 2, at 179, 189.

■ In contrast to the manufacturers in the stream-of-commerce cases, Hitachi did not utilize the owners of the vessel it "manufactured" as distributors of its product and thus did not take advantage of an indirect marketing scheme. Moreover, Hitachi received no economic benefit, either direct or indirect, from residents of New Jersey. Although it could be argued that Hitachi receives some derivative benefit from the international market for Japanese cars and from the fact that the charterers of the vessel were permitted to unload cars in New Jersey, we believe that this attenuated benefit is insufficient to support the assertion of personal jurisdiction. The only benefit that Hitachi derives from the ability of the vessel to dock in New Jersey and the international market for Japanese cars transported on the vessel is that Hitachi may do more conversion of large vessels into automobile carriers, as opposed to work on smaller ships or other kinds of ship repair. This derivative benefit is similar to the benefit that the local retailer and the regional distributor in *World-Wide Volkswagen* derived from the fact that the cars they sold could freely travel across state lines and stop within the forum state. The ability of the consumer to drive the car sold by the *World-Wide Volkswagen* defendants into the forum state, like the ability of the charterers of the vessel to sail the ship "manufactured" by Hitachi into the forum state, arguably increases the demand for the services performed by the defendants. However, this derivative benefit was found insufficient to support personal jurisdiction over the defendants in *World-Wide Volks-*

2. For a more detailed discussion of the stream-of-commerce theory, and a more extensive compilation of cases using this theory, see Currie, *The Growth of the Long Arm: Eight Years* of Extended Jurisdiction in Illinois, 1963 Ill.L.F. 533; Note, *The Long-Arm Reach of the Courts After Kulko v. Superior Court*, 65 Va.L.Rev. 175 (1979).

*wagen,* and we likewise find it insufficient to support personal jurisdiction over Hitachi in New Jersey.

We recognize that a single contact between the defendant and the forum state may be sufficient to support the assertion of personal jurisdiction over the defendant in a suit arising from this contact. *See McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). However, we believe that initially we must focus on the defendant's conduct to determine whether the nature of this conduct can be said to have put the defendant on notice that it may be called to defend its actions in the forum state. We do not believe that the conversion work performed by Hitachi in Japan constitutes this kind of conduct. . It is true that Hitachi could have foreseen that a ship of this size was capable of transporting cars to any port in the world. However, the Supreme Court put to rest the notion in *World-Wide Volkswagen* that this kind of foreseeability alone is a sufficient basis for personal jurisdiction under the due process clause. *See World-Wide Volkswagen,* 444 U.S. at 295–97, 100 S.Ct. at 566–67. If it were sufficient, the Supreme Court noted, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability would travel with the chattel." *Id.* at 296, 100 S.Ct. at 566. The Supreme Court found this result unacceptable. Were we to accept DeJames' foreseeability argument in this case, Hitachi would be amenable to suit in every forum where a ship on which it had done conversion work, and over which it exercised no control, could be found.

The conversion work done by Hitachi was performed exclusively in Japan and had no connection with the state of New Jersey.

Even accepting DeJames' characterization of Hitachi as the "manufacturer" of the vessel, Hitachi sold its product to the ultimate "consumer" when it returned the converted vessel to its owners in Japan. The fortuitous circumstance that the owners chose to dock in New Jersey is insufficient to support the assertion of jurisdiction over Hitachi under the New Jersey long-arm rule.

### B.

Having affirmed the conclusion of the district court that Hitachi's contact with the state of New Jersey was insufficient to support the assertion of personal jurisdiction over Hitachi, we now address DeJames' argument that the district court erred in refusing to aggregate Hitachi's contacts with the United States as a whole. On appeal, DeJames does not quarrel with the conclusion of the district court that when Congress has not authorized nationwide service of process, a federal district court's power to require a defendant to submit to its jurisdiction is limited by the Federal Rules of Civil Procedure, and through them by the long-arm rule of the state in which it sits. As we noted above, we believe the district court was correct in reaching this conclusion. DeJames now contends, for the first time on appeal, that process was served in accordance with the *Convention on the Service Abroad of Judicial & Extrajudicial Documents in Civil and Commercial Matters,* 20 U.S.T. 361 (1969). He argues that the international treaty, combined with rule 4(d)(3) of the Federal Rules of Civil Procedure, effects a "wholly federal means" of service, and that the district court should have aggregated all of Hitachi's contacts with the United States to support the assertion of jurisdiction.[3]

3. We will accept for purposes of this appeal DeJames' position that if service can be made by wholly federal means all of Hitachi's contacts with the United States may be aggregated to support jurisdiction in the District of New Jersey, even if these contacts are limited exclusively to Hawaii, to Alaska, or to a few states on the west coast. As we noted earlier, the *Fraley* court stated that the fourteenth amendment standards of due process announced in *International Shoe* and its progeny also apply to cases grounded on a federal claim, which is governed by fifth amendment standards. *See* 397 F.2d at 3. Even if this statement is not read to limit the jurisdictional inquiry to contacts with the forum state, we are not sure that some geographic limit short of the entire United States might not be incorporated into the

 Counsel for DeJames has not presented us with a valid reason why the district court was not apprised of the fact that service was made in compliance with this treaty. However, the national-contacts theory was presented to the district court, and Hitachi does not dispute that process was served in accordance with the terms of the treaty.[4] Moreover, Hitachi addresses this issue in its appellate brief and does not appear to object to DeJames' failure to bring the treaty to the district court's attention. Therefore, we will address DeJames' new assertion that there was a wholly federal means available, with which he actually complied.

 We cannot accept DeJames' argument that rule 4(d)(3) provides the requisite federal authority to utilize the methods of serving process contained in the treaty. Rule 4(d)(3) allows personal service to be made "by delivering a copy of the summons to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process," when such officer or agent is an inhabitant of, or can be found within, the forum state. *See, e. g., Bernardi Bros. v. Pride Manufacturing, Inc.,* 427 F.2d 297, 298 (3d Cir. 1970). In this case, no officer or agent of Hitachi was served in New Jersey. Even if we accept DeJames' argument that the Japanese Minister of Foreign Affairs was authorized by law to receive service on Hitachi, the Minister of Foreign Affairs received the request for service on Hitachi in Japan. The only entity within New Jersey that handled a copy of the complaint was the United States Marshal's office in Camden, New Jersey. The Marshal's office is not authorized to receive service on Hitachi in New Jersey. Under the terms of the treaty, the United States Marshal's office merely transmits a request for service to the Japanese Minister of Foreign Affairs in Japan. The Minister of Foreign Affairs then serves a copy on the defendant in Japan. Because no service was effected within the territorial limits of New Jersey, DeJames' reliance on rule 4(d)(3) is misplaced.

Having rejected DeJames' claim that rule 4(d)(3) authorizes service of process on a foreign defendant outside the United States, we do not believe that service on Hitachi in accordance with the treaty constitutes service by "wholly federal means." We base this conclusion on the nature and purpose of the treaty, its applicability to state-court litigation, and its intended interaction with the Federal Rules of Civil Procedure.

The treaty was intended to further international judicial cooperation among nations for the increasing number of cases both here and abroad that had international overtones. Numerous problems had surfaced in connection with international judicial assistance, primarily due to the inconsistent procedural requirements imposed by different nations. American plaintiffs sometimes found it difficult, or prohibitively expensive, to effect service in a manner that complied both with the federal or state statute authorizing such service and the requirements of the country in which the defendant was served. *See, e. g.,* Jones, *International Judicial Assistance: Chaos and a Program for Reform,* 62 Yale L.J. 515, 534–538 (1953); Miller, *International Cooperation in Litigation Between the United States and Switzerland: Unilateral Procedural Accommodation in a Test Tube,* 49 Minn.L.Rev. 1069, 1075–1086 (1965). Foreign plaintiffs who wished to serve American defendants in the United States often encountered difficulties because there was no central authority to assist them, and local officials who were authorized to effect service were often unfamiliar with the pro-

---

"fairness" component of the fifth amendment. For a discussion of possible fifth amendment limitations, see *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191, 198–204 (E.D. Pa.1974).

4. In addition, even if the state procedures were utilized, the limitations that accompany service under a state long-arm rule do not apply if a wholly federal means of effecting service of process is available. *See Hartley v. Sioux City & New Orleans Barge Lines, Inc.,* 379 F.2d 354, 356 (3d Cir. 1967).

cedural requirements of the civil-law countries. *See* Note, *The Effect of the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 2 Cornell Int'l L.J. 125 (1969). Moreover, certain civil-law countries authorized methods of service that failed to give notice to the American defendant, thereby creating the risk that an American defendant would suffer a default judgment in that country without having had an opportunity to defend the claim. *See, e. g., Report of the Senate Committee on Foreign Relations on the Convention on the Service Abroad of Judicial and Extrajudicial Documents*, S.Exec.Rep. No. 6, 90th Cong., 1st Sess. 11–12 (April 12, 1967) (Statement of Philip W. Amram) [hereinafter cited as *Senate Executive Report*].

■ In order to alleviate the problems mentioned above, the United States entered into a multilateral treaty. This treaty provides for methods of serving judicial and extrajudicial documents that the signatories to the treaty have agreed to honor. It provides that each signatory shall designate a Central Authority to process requests for service, but it also allows service to be effected without utilizing the Central Authority as long as the nation receiving service has not objected to the method used. Thus, the more liberal methods provided in the Federal Rules of Civil Procedure and state long-arm rules may be used as long as the nation receiving service has not objected to them. *See, e. g., Shoei Kako Co. v. Superior Court*, 33 Cal.App.3d 808, 109 Cal. Rptr. 402 (1973); *Senate Executive Report* at 13 (Statement of Philip W. Amram).

■ The purpose of the treaty is set forth at its beginning:

The States signatory to the present Convention,

Desiring to create appropriate *means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time*,

Desiring to improve the organization of mutual judicial assistance for that purpose *by simplifying and expediting the procedure*,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions.

20 U.S.T. at 362 (emphasis added). We believe that the purpose and nature of the treaty demonstrate that it does not provide independent authorization for service of process in a foreign country. The treaty merely provides a mechanism by which a plaintiff authorized to serve process under the laws of its country can effect service that will give appropriate notice to the party being served and will not be objectionable to the country in which that party is served.

We find further support for this conclusion in the fact that the treaty applies to parties desiring to make service in state-court proceedings. The nature of the judicial system of the United States, which includes not only the federal courts but also the many state systems with their differing procedural requirements, was one of the primary justifications for entering into a treaty that would provide a uniform, valid method of effecting service. In supporting the statute that authorized the establishment of the Commission on International Rules of Judicial Procedure, Lloyd Wright, then President of the American Bar Association, observed:

With 49 separate procedural jurisdictions in the United States ... a unitary approach is the only solution. We can hardly expect [a foreign government] to look favorably on a program of separate negotiation with the representatives of each of the 48 states and with the representatives of the Federal Government. The problems must be solved through a single, unified set of discussions, the results of which will be effective for all of the 49 jurisdictions.

Commission on International Rules of Judicial Procedure—Establishment, S.Rep. No. 2392, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.Code Cong. & Admin.News 5201, 5206.

■ By virtue of the supremacy clause, the treaty overrides state methods

of serving process abroad that are objectionable to the nation in which the process is served. However, we do not believe that the treaty in any way affects a state's chosen limits on the jurisdictional reach of its courts.[5] If a state long-arm rule does not authorize service outside the United States, a litigant in that state would have no authority to invoke the methods of serving process provided in the treaty. We believe that the treaty merely serves as an important adjunct to state long-arm rules, and that it specifies a valid method of effecting service only if the state long-arm rule authorizes service abroad.

Further, we believe that the same principle applies to the use of the treaty in conjunction with the Federal Rules of Civil Procedure. Under rule 4, DeJames could serve process on Hitachi in Japan under either rule 4(e) or rule 4(i). However, service may be made under rule 4(e) only "[w]henever a statute of the United States or an order of court thereunder" or "a statute or rule of court of the state in which the district court is held" provides for service on a party who is not an inhabitant of or found within the forum state. Fed.R. Civ.P. 4(e). The alternative methods of serving process in a foreign country contained in rule 4(i) come into play only "[w]hen the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not an inhabitant of or found within the forum state." Fed.R. Civ.P. 4(i). Therefore, in order for DeJames to validly serve process on Hitachi in Japan, there must not only be a method for effecting such service but also a state or federal statute authorizing service abroad.

Apart from the Federal Rules of Civil Procedure, DeJames points to no federal statute authorizing service of process in admiralty actions. Therefore, unless we hold that the treaty is the equivalent of such a federal service-of-process statute, DeJames is limited by either rule 4(e) or rule 4(i) to the authorization provided in the New Jersey long-arm rule. As we noted in our discussion of the purpose of the treaty, we do not believe that the treaty alone provides authorization for service abroad. Nor do we read the treaty as the equivalent of a federal statute authorizing service in a foreign country. Instead, we believe that the treaty is similar to rule 4(i) in that it provides a "manner" of service to be used by a litigant with the requisite authority to serve process. Were we to hold otherwise, we would attribute to the Senate that ratified the treaty the intent to authorize the equivalent of "world-wide" service of process in all federal-question, admiralty, and diversity cases while at the same time not authorizing nationwide service of process for those same claims. In addition, such a holding would give the treaty a different effect when applied to federal rather than state courts.

Our review of the legislative history of the treaty does not reveal such an intent. To the contrary, the *Senate Executive Report* recommending ratification of the treaty provides that the treaty "is in keeping with the spirit and purpose of the law on this subject which is presently in effect in the United States and it will provide increased protection (due process) for American citizens who are involved in litigation abroad." *Senate Executive Report* at 3. Moreover, the testimony before the Senate Committee on Foreign Relations supports our view that the treaty was not intended to effect a change in the authority of courts in the United States to obtain personal jurisdiction over a foreign defendant. Richard D. Kearney, then Deputy Legal Adviser to the Department of State, discussed the liberal methods of serving process under rule 4(i) and stated that the Judicial Conference of the United States had endorsed the treaty as being in accord with the Federal Rules of Civil Procedure. *Senate Executive Report* at 6–7. The testimony of each person appearing before the Senate Committee emphasized that the treaty would not effect any substantial changes in the operation of courts in the United States, but would pro-

---

**5.** *Cf. Senate Executive Report* at 9 (Statement of Joe C. Barrett) ("this convention does not invade the domain of State law in the United States").

vide American citizens greater due process protection in litigation abroad.

■ In light of the legislative history, language, and purpose of the treaty, we believe that the treaty provides an important method of serving process in federal court litigation when a state or federal statute authorizes such service. It does not provide authority for serving process on a foreign defendant in the sense that the type of federal or state service-of-process statute referred to in rule 4(e) and rule 4(i) would provide. Therefore, we conclude that service of process on Hitachi in accordance with the terms of the treaty did not constitute service by "wholly federal means."

In order for DeJames to effect valid service through the use of the treaty, he had to rely on the New Jersey long-arm rule through rule 4(e) or rule 4(i), either of which permits reliance on a state statute that authorizes extraterritorial service of process. The treaty merely provides a method for effecting service to be used by a litigant with the requisite authority to serve process. Whether the service was effected in a manner consistent with the state long-arm rule, in accordance with rule 4(e), or the law of Japan, in accordance with rule 4(i)(1)(A), the authority to effect service is found in the state long-arm rule. Because we have held that Hitachi's contact with the State of New Jersey was insufficient to support the assertion of personal jurisdiction under the state long-arm rule, we affirm the district court's conclusion that it had no personal jurisdiction over Hitachi.

## III.

The order of the district court dismissing the complaint against Hitachi will be affirmed.

GIBBONS, Circuit Judge, dissenting:

I agree with the majority that the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 20 U.S.T. 361–367 (1969), does not afford a "wholly federal" means of service of process on a foreign national corporation. Like the majority, I believe the Convention, rather than creating an independent source of adjudicatory competence, facilitates and provides a uniform method of service of process pursuant to some already extant state or federal statute or rule. Unlike the majority, however, I believe Hitachi's relation to New Jersey satisfies the fourteenth amendment due process concerns the Supreme Court enunciated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The majority relies on *World-Wide Volkswagen* to hold that Hitachi had no "reasonable expectation" of being haled before a court in New Jersey. The majority analogizes Hitachi to the local dealers involved in *World-Wide Volkswagen*. This analogy is off the mark.

In *World-Wide Volkswagen* the Supreme Court held that a local dealer may not be called to account in a distant place for a product not of its manufacture sold in a restricted market. The Court made clear that Judge Sobeloff's famous hypothetical of the California gas station owner who sells a tire that blows out following a cross country trip to Pennsylvania, *Erlanger Mills Inc. v. Cohoes Fibre Mills Inc.*, 239 F.2d 502, 507 (4th Cir. 1956), *cited in World-Wide Volkswagen, supra*, at 296, would remain confined to Civil Procedure texts. *See* Comment, *Federalism, Due Process and Minimum Contacts: World-Wide Volkswagen v. Woodson*, 80 Colum.L.Rev. 1341, 1358–61 (1980). At the same time, the Court reaffirmed the principle that a manufacturer who injects a product into the stream of interstate commerce may be subject to personal jurisdiction in the state where the product causes harm. 444 U.S. at 297, 100 S.Ct. at 567. That manufacturer may be subject to a foreign state's jurisdiction even if his defective product arrived in the forum through the activities of a manufacturer or distributor further down the chain of production or sale. The Court's approving reference to the Illinois Supreme Court's celebrated decision in *Gray v. American Radiator and Sanitary*

*Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961), 444 U.S. at 298, 100 S.Ct. at 568; is particularly pertinent here. In *Gray*, a defective valve made in Ohio was incorporated into a water heater manufactured in Pennsylvania. The water heater exploded in Illinois. Although Titan Valve Manufacturing Co. maintained it had no contacts with Illinois, the Illinois court held that Titan's indirect contacts through the manufacture and sale of valves to be incorporated in water heaters destined for interstate markets, including Illinois, satisfied the *International Shoe* minimum contacts and fairness tests.

Thus, *World-Wide Volkswagen* permits assertion of jurisdiction over one who manufactures a finished product and sells it to another manufacturer or distributor who will send the product into interstate commerce, even though the first manufacturer's only direct contact with the forum state is the harm its product caused. One who forms an integral link in the chain of interstate manufacture or distribution is not a "local dealer." A local dealer is at the end of the chain of production or distribution. A local dealer has no interest in the ultimate destination of the goods once they have been purchased by the consumer. It did not matter to the New York car distributors in *World-Wide Volkswagen* or to Judge Sobeloff's California gas station owner whether, once purchased, their products traveled out of state or around the corner. These sellers derived no benefit from their customers' choice of where to take the product. In contrast, Titan Valve, while not directly responsible for the appearance of its product in Illinois, benefitted by selling its goods to American Radiator for inclusion in products intended for interstate sale. Titan could not reasonably claim not to expect, nor disavow the desire that its product would end up in foreign fora.

Applying these principles to Hitachi, it is readily apparent that Hitachi is not a local dealer. It is true that Hitachi converts bulk carriers to automobile carriers in Japan, to the order of Japanese vessel owners.

It is also true that Hitachi does not control the ultimate destination of its products. But these facts do not reveal the whole story. Hitachi's ships are an integral part of the chain of international commerce in Japanese automobiles. Hitachi's ships carry Japanese automobiles to American and New Jersey ports. The Port of New York-New Jersey is this nation's largest, receiving over 185,292,125 tons of cargo per year. The New Jersey ports of Paulsboro, Camden-Glouster, and Trenton Harbor together account for another 28,533,725 tons per year. 1981 World Almanac and Book of Facts at 204. It is not "merely foreseeable," but virtually inevitable that ships Hitachi converts will dock in New Jersey.

Nor can it be said that Hitachi has no substantial interest in the destination of the ships it converts. Just as Titan Valve benefitted by sale of its products to another manufacturer who would send the valves into interstate commerce, so Hitachi benefits by selling its vessels to shipowners who will take them to New Jersey ports. Hitachi's ship conversion business is a vital component of the process of distribution of Japanese automobiles in the United States. The American market for Japanese cars enhances Hitachi's ship conversion business. The majority suggests this derivative benefit is too attenuated, for were there no American market for Japanese cars, Hitachi would convert vessels to something other than automobile carriers. At 285. That argument misses the point. The relevant question is whether Hitachi's status as an intermediate link in the chain of Japanese car distribution benefits the business in which Hitachi is in fact engaged.

The majority also suggests that there is a dispositive distinction between Hitachi's relation to the vesselowners and a manufacturer who through a subsequent manufacturer or distributor "takes advantage of an indirect marketing scheme." At 285–286. It is true that the vesselowners do not market Hitachi's ships. But both the vesselowners and Hitachi aid in the American marketing

of Japanese cars. The majority looks at the wrong market. The relevant market is not the Japanese market for Japanese automobile carriers, but the market for which Japanese automobile carriers are essential—the American market for Japanese cars. I perceive no valid distinction between a manufacturer whose product serves as a link in the chain of production of another product, and one whose product forms an essential link in the chain of distribution of another product, at least when sale of the second product directly promotes production and sale of the first product. Thus I would hold that assertion of personal jurisdiction in New Jersey over Hitachi is consistent with *World-Wide Volkswagen.*

Finally, while it is not crucial to the disposition of this case, I believe the misconception underlying the majority's statement that the fourteenth amendment governs amenability to suit on a federal claim, at 284–285, should be exposed and criticized. The fourteenth amendment due process clause does not properly apply in all its aspects to federal question claims. In *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court established a two-pronged test to determine the constitutionality of a state's assertion of personal jurisdiction over an out-of-state defendant. A state's exercise of jurisdiction must comport with traditional notions of fundamental fairness, and it must be consistent with the values of federalism embodied in the fourteenth amendment. *See Jonnet v. Dollar Savings Bank,* 530 F.2d 1123, 1132, 1140 (3d Cir. 1976) (Gibbons, J., concurring). *Cf. World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). When a court asserts personal jurisdiction over a foreign defendant on the basis of a state law claim, it must ensure that the forum state does not unduly encroach on a sister state's interests. When a court, state or federal, adjudicates a federal claim, the federalism issue is of no relevance, for the court determines the parties' rights and liabilities under uniform,

national law. No state intrudes on another's interests. The only relevant interest is the national one. Thus the applicable constitutional due process provision should not be the fourteenth amendment, but the fifth amendment.

The fifth amendment requires only that the forum be a fair and reasonable place at which to compel defendant's appearance, and that he have had notice and a reasonable opportunity to be heard. *See Stabilisierungsfonds fur Wein et al. v. Kaiserstuhl Wine Distributors Pty. Ltd. et al.,* 647 F.2d 200 (D.C.Cir.1981), at 203 & n.4. A defendant's *national* contacts enter into the fifth amendment fairness analysis, for it would be unreasonable to subject to suit in the United States a foreign national defendant who had but one fleeting connection with this country. But it is not necessary, under the fifth amendment due process clause, that that defendant's contacts relate primarily to the particular United States location in which the claim arose. Thus, for example, it would not be unfair under the fifth amendment to subject a foreign national shipper to suit in New Jersey on the basis of an admiralty claim that arose in that state, even if the offending ship was the only one ever to dock in New Jersey, and all of defendant's other ships land in Texas. The hypothetical defendant has sufficient contacts with the United States, and the availability of witnesses points to the District of New Jersey as the most convenient forum for the litigation. *Cf. Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977) (central concern of jurisdictional inquiry is relationship among the defendant, the forum, and the litigation).

Similarly, were a state court adjudicating a federal claim, the relevant due process standard should remain the fifth amendment. The nature of the claim, not the identity of the court, should determine the appropriate due process test. New Jersey has enacted a "constitutional" long arm: its courts may assert personal jurisdiction to

the limits of the relevant due process clause. A federal court in a federal question case referred under Federal Rule of Civil Procedure 4(e) to the New Jersey long arm thus must ask two questions: Would assertion of personal jurisdiction violate the fifth amendment? and, Has New Jersey placed any restriction on the constitutionally exercisable scope of jurisdiction? The answer to the second question is no, and therefore when addressing a federal claim, the federal court, or for that matter, a New Jersey court, need consider only the issue of fifth amendment fairness in determining whether to assert personal jurisdiction over the foreign defendant.

On the other hand, one might ask whence derives a state legislature's authority to enact a competence statute of national application. The majority implies that a state legislature may permit assertion of adjudicatory competence to the limits of judicial jurisdiction under the fourteenth amendment, but it may not implement the fifth amendment by conferring competence to the limits of the federal due process clause. But a state long arm implements neither the fourteenth nor the fifth amendment. A state's authority to promulgate rules of competence derives from a state's sovereign power to adjudicate state law and federal question cases, and indeed to rule on controversies arising under a foreign nation's law. This power is preserved to the states through the tenth amendment, although it may be limited by congressional provision for exclusive federal court subject matter jurisdiction.[1] The fifth amendment simply defines the boundaries within which a state may adopt a rule of competence to assert personal jurisdiction in federal question cases.

Thus, while Rule 4(e) has the effect of converting a federal court into a state court

for purposes of determining personal jurisdiction, the rule does not automatically make the fourteenth amendment the guiding due process provision. The rule's real "anomaly" arises in instances where a federal court is referred to the long arm of a state whose legislature, unlike New Jersey's, has determined not to permit assertion of personal jurisdiction to the full extent constitutionally permissible. In those instances, Congress' failure to enact a general federal question competence statute has the result of bringing to bear on federal claims, to which federalism concerns have no relevance, individual state legislatures' decisions in effect to protect out-of-state defendants from suit on state law claims. *Cf.* von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv.L.Rev. 1121, 1123–25 n.6 (referencing cases in which general federal policies qualify statutory incorporation of state law, and suggesting courts disregard state law provisions that are irrelevant in the federal context).

Since both as a matter of fourteenth amendment due process and as a matter of fifth amendment due process, the majority's analysis of jurisdiction to adjudicate in this case is flawed, I dissent. I would reverse the judgment dismissing the complaint for lack of personal jurisdiction.

---

1. In the case of admiralty claims, federal court jurisdiction is exclusive over the subject matter, but state laws concerning competence to assert personal jurisdiction still obtain, since rather than preempting them with an applicable federal competence statute, Congress through rule 4(e) has referred back to state rules of adjudicatory competence. *Compare* 15 U.S.C. § 77v (Securities Act of 1933); 15 U.S.C. § 78aa (Securities Exchange Act of 1934).