**EPLUS TECHNOLOGY, INC., Plaintiff,**

v.

**Patricia ABOUD, et. al., Defendants.**

**No. CIV. A. 00–699–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 10, 2001.

Michael E. Geltner, Geltner & Associates, Washington, DC, for Plaintiff.

John Francis Cahill, Carter, Ledyard & Milburn, Washington, DC, for Defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

This common-law fraud and RICO[1] action against Canadian defendants presents questions of personal jurisdiction and sufficiency of service under Rule 4(f), Fed. R.Civ.P., and the Hague Convention. Also presented is the question of whether the complaint states a valid RICO claim.

### I.

Plaintiff ePlus Technology, Inc. is a Virginia corporation doing business as a supplier of computer equipment. Defendants Patricia Aboud, George Bernachawy, and Jean–Marie Chartouni are Canadian citizens and residents of Montreal, Quebec, Canada. Defendant Daniel Ackerib is a resident of Florida.

Plaintiff entered into a contract in May or June of 1999 with Micro Business Technology ("MBT"), a Canadian corporation owned and operated by defendants. Plaintiff's amended complaint alleges that defendants used MBT to perpetrate fraud on more than twenty-seven computer equipment suppliers in the United States, including plaintiff. Specifically, the complaint alleges that defendants called various suppliers, including plaintiff, and made misstatements so as to obtain shipments of computer supplies to MBT on credit. It is further alleged that defendants would cause MBT to pay the suppliers a portion of what was due on the orders for the purpose of inducing further, larger shipments. Plaintiff also alleges that defen-

dants advised potential suppliers to call MBT's current clients, including plaintiff, to verify that defendants had good credit. According to the complaint, once the larger shipments were received on credit, defendants ceased making payments. Plaintiff further alleges that the defendants then caused MBT to file for bankruptcy, leaving its creditors in the United States, including plaintiff, with large financial losses. Specifically, plaintiff alleges that on March 23, 2000, Bernachawy called plaintiff and ordered a shipment of goods, and that this order was based on a check defendants knew would not clear because they had already filed for bankruptcy at that time. Plaintiff claims it relied on Bernachawy's false statement and shipped goods in the amount of $297,141, for which defendants never paid. Finally, plaintiff alleges that defendants have operated similar enterprises in the past to obtain goods on credit fraudulently, then to sell the items for cash, and finally to declare bankruptcy to avoid payment.

On April 27, 2000, plaintiff filed its complaint against the four defendants alleging that their actions constituted fraud and RICO violations. Ackerib was personally served in Florida. Service was accomplished on the remaining defendants by mail through the Secretary of the Commonwealth of Virginia pursuant to Virginia Code § 8.01–329, which provides that when the person to be served is not a resident of Virginia, the plaintiff may serve process on the Secretary of the Commonwealth, together with the defendant's last known address, and the Secretary will then mail the process via certified mail to the person to be served at the address

---

**1.** Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (hereafter "RICO").

provided. *See* Va.Code § 8.01–329. Accordingly, service for Aboud was mailed to her home in Montreal, Canada. Because plaintiff lacked addresses for defendants Bernachawy and Chartouni (neither of whom was listed in the Montreal directories), the summons for each of these defendants was directed via the Secretary of the Commonwealth to MBT's address in Montreal.

None of the defendants filed a timely responsive pleading pursuant to Rule 12, Fed.R.Civ.P. Ackerib filed no response at all and was therefore found to be in default. Because he had been served personally in Florida, issues of sufficiency of service did not arise and his default led ultimately to the entry of a final judgment against him.[2]

Although Aboud also failed to file a timely response to the complaint, she avoided default by the entry of a consent order granting her an extension of time to respond to the complaint. In her response, Aboud moved to dismiss plaintiff's complaint for failure to state a cause of action pursuant to Rule 12(b)(6), Fed. R.Civ.P., and for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed. R.Civ.P. The jurisdictional motion was denied,[3] but the Rule 12(b)(6) motion was granted as to the RICO claim based on a pleading defect, which plaintiff was allowed to remedy by filing an amended complaint. *See ePlus Technology, Inc. v. Aboud,* Civil Action No. 00–699–A (E.D.Va. August 18, 2000) (order). On August 28, 2000, plaintiff filed an amended complaint, which Aboud answered.

Bernachawy and Chartouni filed no response at all, leading plaintiff to move for default judgment against them in the same amount as the judgment entered against Ackerib. Following entry of default, notice issued for an *ex parte* proof of damages hearing to take place on August 4, 2000. Again, Bernachawy and Chartouni did not appear. A magistrate judge issued a Report and Recommendation on August 11, 2000, recommending that a default judgment be entered against both defendants as to the fraud count in the amount of $297,141 plus attorney's fees and costs in the amount of $14,948.94.[4]

On or about August 24, 2000, Bernachawy and Chartouni, by counsel,[5] filed an objection to the magistrate judge's recommendation of default on the ground of insufficiency of service, namely that neither Bernachawy nor Chartouni had ever used the MBT address, and thus any process directed to that address was not reasonably calculated to reach them. As such, these defendants argued, the mail service was insufficient because it violated

---

**2.** Final judgment was entered against Ackerib on the fraud charge in the amount of $297,141.00. *See ePlus Technology, Inc. v. Aboud,* Civil Action No. 00–699–A (E.D.Va. July 17, 2000) (order). The judgment included an award of attorney's fees and costs in the amount of $14,948.94. Because no judgment was entered on the RICO count, the damages were not trebled.

**3.** Exercise of personal jurisdiction over Aboud was held appropriate under Virginia's long-arm statute, Va.Code § 8.01–328.1(A)(1), and consistent with due process. *See ePlus Tech-*

*nology, Inc. v. Aboud,* Civil Action No. 00–699–A (E.D.Va. August 18, 2000) (order).

**4.** Because the Report and Recommendation was based on plaintiff's original complaint, the pleading defect with respect to the RICO count remained, and the magistrate judge recommended that judgment not be entered for that count. *See ePlus Technology, Inc. v. Aboud,* Civil Action No. 00–699–A (E.D.Va. August 11, 2000) (report and recommendation)

**5.** Bernachawy and Chartouni retained Aboud's counsel to represent them as well.

due process. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Bernachawy and Chartouni also claimed they had no knowledge of the case until August 16, 2000. Additionally, Chartouni provided affidavits as to his and Bernachawy's addresses. According to the affidavits, neither defendant was a citizen of Virginia, nor had either visited the state or personally transacted business there.

In light of this objection, the matter was remanded to the magistrate judge to consider whether the service by mail on Bernachawy and Chartouni using the MBT address was proper. On April 13, 2001, the magistrate judge issued a second Report and Recommendation, recommending a finding that although mail service was a proper method of service, the address to which the service was made was not reasonably calculated to give defendants notice because plaintiff knew that MBT had declared bankruptcy and that its offices had been vacated a month prior to the attempted service. Thus, the magistrate judge correctly concluded that mailed service on these defendants at MBT's address did not satisfy due process and that additional time should be allowed for plaintiff to serve Bernachawy and Chartouni in some other proper manner. This Court accepted the magistrate judge's recommendation and issued an order postponing the scheduled April 23 trial to allow plaintiff one further opportunity to effect service on both defendants. *See ePlus Technology, Inc. v. Aboud,* Civil Action No. 00–699–A (E.D. Va. April 20, 2001) (order).

Plaintiff's subsequent efforts to serve Bernachawy and Chartouni in Canada involved sending a private process server to Montreal to effect service. This process server's declarations reflect that he traveled to Montreal on April 18, 2001 to serve alias summonses on Bernachawy and Chartouni. To this end, the process server checked the Quebec directory listings for 2001, 2000, and 1999, but found no listing for Jean–Marie Chartouni. The process server then visited the address provided by Chartouni in his affidavit and waited in vain for someone to appear at the apartment.

That evening the process server, using the telephone number for Bernachawy listed in Chartouni's affidavit, contacted Bernachawy to make an appointment to serve process on him the following day. Bernachawy and the process server made an appointment to meet at 7 a.m. As arranged, the process server appeared at Bernachawy's address between 6 a.m. and 7 a.m. the next morning. Before 7 a.m., he observed a woman and a teenage boy exiting Bernachawy's house, and he approached them and asked for Bernachawy. The woman, who identified herself as Bernachawy's wife, said he had already left. The process server explained who he was and stated that since Bernachawy had already left, he would leave the court papers with her. When she refused to accept the papers, he placed them at her feet and walked away. As he drove off, the process server observed that Bernachawy's wife had retrieved the papers and was reading them.

Thereafter, the process server turned his attention back to Chartouni. In this regard, he returned to the address listed by Chartouni in his affidavit and interviewed the neighbor in the next apartment. The neighbor stated that Chartouni's mother and sister lived in the apartment, and that Chartouni himself visited, but did not live there. This information was repeated by the building manager, who also informed the process server that the listing on the apartment house for the apartment in question only says "occupe," meaning that the apartment is occu-

pied, but the occupant does not wish to reveal his or her name.[6] Thereafter, the process server spent the day surveilling the apartment. When he knocked on the door, it became apparent that the occupants, although present, were refusing to answer the door. Similarly, the occupants refused to answer the telephone connecting the building lobby with the apartment. Later that evening, the process server attached the alias summons and complaint to the door of the apartment.

Bernachawy and Chartouni have filed a motion to dismiss the amended complaint for (i) insufficient service of process pursuant to Rule 12(b)(5), Fed.R.Civ.P., (ii) lack of personal jurisdiction pursuant to Rule 12(b)(2), and (iii) failure to state a RICO cause of action pursuant to Rule 12(b)(6). For the reasons stated below, defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) should be granted.

## II.

Rule 4(f)(1), Fed.R.Civ.P., which governs service on individuals in a foreign country, provides that such service may be effected "by any internationally agreed means reasonably calculated to give notice." In this respect, the Rule refers explicitly to the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and

Commercial Matters, 20 U.S.T. 362 (1964), commonly known as the Hague Convention. This convention, to which Canada and the United States are signatories, provides a simple and straightforward mode of service of process for all civil and commercial cases where, as here, a party transmits judicial documents for service abroad. *See Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) ("The [Hague Convention] was intended to provide a simpler way to serve process abroad."). Specifically, the Hague Convention provides that each signatory country shall designate a "Central Authority" (usually that country's department of justice)[7] to receive judicial documents from abroad. This Central Authority then serves the process or other documents on parties within the country according to that country's internal law. Yet, this is not the sole or exclusive mode of service permitted under the Hague Convention; litigants of signatory nations are also allowed to undertake various alternative methods of service under certain circumstances. For instance, Article 8 of the Hague Convention provides that each signatory nation may effect service abroad directly through that nation's diplomatic or consular agents.[8] And, Article 10 of the

---

**6.** While the neighbor and the building manager both claimed that Chartouni did not live at the apartment in question, these statements are conclusively rebutted by Chartouni's own sworn affidavit dated August 24, 2000, in which Chartouni states that he resides at the apartment in question.

**7.** Article 18 of the Hague Convention allows federal states to designate multiple central authorities as they see fit. In pertinent part, Article 18 provides: "Federal States shall be

free to designate more than one Central Authority." 20 U.S.T. 362, Art. 18. Canada has established a Central Authority for each of its provinces, as well a national Central Authority. *See* Declaration of Canada *following* Hague Convention, § A(1).

**8.** Article 8 provides that each contracting state "shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents." 20 U.S.T. 362, Art. 8.

Convention allows for service of judicial documents directly through postal channels or the judicial officers of the receiving country.[9] Still, another service option is found in Article 11, which provides that "[t]he present Convention shall not prevent two or more contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding articles." 20 U.S.T. 362, Art. 11. But particularly pertinent here is the service option provided in Article 19, which states that "[t]o the extent that the internal law of a contracting State permits methods of transmission, other than those provided for in the preceding articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions." 20 U.S.T. 362, Art. 19.

Here, plaintiff elected not to avail itself of the Convention's principal option to serve process through Canada's or Quebec's Central Authorities. Instead, plaintiff chose to employ a private server to deliver the documents to Bernachawy's spouse and to post the documents at Chartouni's residence. Plaintiff argues that these alternative service methods are valid under Article 19 of the Convention because that article must be read generously to allow any alternative service method to which neither Canada nor Quebec explicitly object. In other words, plaintiff argues that under Article 19, service is permitted and hence valid unless it is specifically prohibited by Canada or Quebec. Defendants read Article 19 quite differently. In their view, Article 19's plain language allows only those alternative service methods expressly sanctioned by the law of Canada or Quebec, which they allege do not include the methods plaintiff's process server used here. This dispute over the meaning of Article 19 stems from a claimed ambiguity in the phrase "[t]o the extent that the internal law of a contracting State *permits* the methods of transmission" (emphasis added). Plaintiff claims the contracting State "permits" all alternative service methods not explicitly prohibited by that State, whereas defendants claim a contracting State only "permits" the service methods it specifically adopts.

█ There is no controlling circuit authority on this dispute over the meaning of Article 19.[10] The sparse authority on point from other jurisdictions provides little

---

*Contracting states may choose to object to* this provision under Article 21. 20 U.S.T. 362, Art. 21. Article 21 provides in pertinent part that "[e]ach contracting State shall [at the time of the deposit of its instrument of ratification or accession, or at a later date] inform the Ministry [of Foreign Affairs of the Netherlands], where appropriate, of-
(a) *opposition to the use of methods of* transmission pursuant to articles 8 and 10." 20 U.S.T. 362, Art. 21.

9. Article 10 states as follows: "Provided the State of destination does not object, the present Convention shall not interfere with-
(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
(b) the freedom of judicial officers, officials, or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination." 20 U.S.T. 362, Art.10. As with Article 8, contracting states may choose to object to this provision pursuant to Article 21. 20 U.S.T. 362, Art. 21

10. The meager authority in this circuit concerning the Convention does not address this precise question. For example, in *Koehler v. Dodwell*, 152 F.3d 304, 308 n. 3 (4th Cir. 1998), the panel found that service was proper under other provisions of the Hague Convention and hence did not reach the question of sufficiency of service under Article 19.

guidance,[11] and the commentators are split on the question.[12] Accordingly, the question of Article 19's meaning must be resolved by applying settled principles of statutory construction, as these principles are also fully applicable to the interpretation of treaties.[13]

■ It is a cardinal interpretive principle that "statutory analysis begins with 'the language of the statute. And when the statutory language provides a clear answer, it ends there as well.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (citations omitted)). Moreover, "[i]n the absence of an indica-

Also inapposite is *Heathmount A.E. Corp. v. Technodome.Com*, 106 F.Supp.2d. 860 (E.D.Va.2000). That case did not present the Article 19 question presented here; it was, instead, an *in rem* proceeding involving court-ordered service in compliance with Ontario law.

11. See *Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F.Supp.2d 1273, 1279–80 (S.D.Fla.1999) (service of process in Spain by a private individual is proper under Article 19 even though Spain did not expressly authorize such service: "Spain does not prohibit service of a summons arising out of foreign litigation upon a foreign national via hand delivery by a private process server."). See *also DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 288 (3d Cir.1981) (though not expressly addressing Article 19, holding that the Convention "allows service to be effected without utilizing the Central Authority as long as the nation receiving service has not objected to the method"); *Lemme v. Wine of Japan Import, Inc.*, 631 F.Supp. 456, 464 (E.D.N.Y.1986) (not addressing Article 19, but holding that a party may serve process abroad under any method permitted by the federal rules as long as the country receiving the service has not objected to that method in the Hague Convention or otherwise). *But see Dahya v. Second Judicial Dist. Court ex rel. County of Washoe*, 19 P.3d 239, 243 (Nev.2001) ("[A] broad interpretation would not promote uniformity or alleviate confusion as the drafters [of the Convention] intended. Rather, it would force signatory states to once again embrace a multifarious set of service methods that contradict both the state's internal laws and the Convention."); *In re Hunt's Pier Associates*, 156 B.R. 464, 470 (E.D.Pa.1993) ("[O]nly if service is valid under the service rules of the destination country can it be found that the destination country does not 'object' to the form of service utilized.").

12. See, *e.g.*, Donald Siegle, *Supplemental Practice Commentaries*, § C4–24 at 64, following 28 U.S.C.A. Rules of Civil Procedure, Rule 4 (West Supp.1998) ("In order to use one of the methods Rule 4(f) authorizes in paragraph (2), for example, one should not have to show that the method has a precise counterpart (and just how precise?) in the foreign nation's law."); Committee on Federal Courts of the New York State Bar Ass'n, *Service of Process Abroad: A Nuts and Bolts Guide*, 122 F.R.D. 63 (1989) ("[A]lthough compliance with the Convention is 'mandatory,' that compliance encompasses methods of service that the Convention or the internal law of the foreign state expressly permit but also those methods that neither the Convention nor the internal law of the foreign state prohibit."). *But see* Gary A. Magnarini, *Service of Process Abroad Under the Hague Service Convention*, 71 Marq. L.Rev. 649, 681–682 (1988) ("In light of the original purpose of article 19, courts should narrowly construe it and only allow the use of alternative service methods which foreign law specifically authorizes."); G. Brian Raley, *A Comparative Analysis: Notice Requirements in Germany, Japan, Spain, the United Kingdom and the United States*, 10 Ariz. J. Int'l & Comp. L. 301, 308 (1993) ("Article 19 provides for service by means of additional methods authorized by the receiving country for the transmission of documents from abroad. Contracting states generally construe this provision narrowly, thus permitting service only by means specifically enumerated in the receiving country's laws.").

13. See *Schlunk*, 486 U.S. at 699–700, 108 S.Ct. 2104 ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used. Other general rules of construction may be brought to bear on difficult or ambiguous passages.") (citations and internal quotation marks omitted).

tion to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metropolitan Educ. Enter., Inc.*, 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). Finally, accepted canons of statutory construction instruct that courts may resolve statutory ambiguities by referencing to a statute's purpose. *See United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This purpose often can be ascertained by an examination of the statute's remaining provisions. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

■ These principles, applied here, point persuasively to the conclusion that the word "permits" in Article 19 must be read, in accordance with its plain meaning, to authorize only those service methods that are explicitly sanctioned by the law of the receiving country. The ordinary, plain meaning of the word "permit" is "to consent to expressly or formally; to grant leave for the privilege of." *Webster's Third New International Dictionary, Unabridged* 1683 (1993). To be sure, some dictionaries define "permit" in a looser, more inclusive sense, such as "to allow" or "not to prevent," *Oxford English Dictionary* (2d ed.1989). Yet, it seems clear that the more common usage of "permit" connotes specifically consenting or "allow[ing] the doing (of something)." *The American Heritage Dictionary of the English Language* (4th ed.2000). Given this, it follows that a contracting state "permits" a service of process method within the meaning of Article 19 when it does so through express authorization.

This conclusion derives further support from other language found in Article 19. Specifically, Article 19 states that where "the internal law of a contracting State permits methods of transmission, other than those provided for in the [Convention], the present Convention shall not affect *such provisions*" (emphasis added). The term "provisions" in this context plainly refers to a contracting state's laws or regulations prescribing modes of serving process. This use of "provisions" in Article 19 confirms that the article uses the verb "permit" to include only express acts of law, rather than the mere absence of an express prohibition.

Yet, additional confirmation for this conclusion is found in the use of the verb "permit" elsewhere in the Convention. Thus, Article 11 states that the Convention does not prohibit two contracting states from *"agreeing to permit,* for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding articles" (emphasis added). It is readily apparent that this use of the term conforms to the plain and ordinary dictionary meaning of express or formal consent. The act of "agreeing" connotes explicit or formal authorization. Clearly the word "agreeing" would be unnecessary in Article 11 if, as plaintiff argues, a contracting state already "permitted" any service method it had not expressly prohibited. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (supporting the proposition that terms of a statute should be interpreted in a uniform manner). Additionally, plaintiff's reading of "permits" in Article 19 would render Article 11 redundant and hence unnecessary. *See Mackey v. Lanier Collection Agency and Service, Inc.*, 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (holding that statutes should not be

interpreted so as to render any of its provisions nugatory).

Finally, the most telling argument against plaintiff's reading of Article 19 is that it would lead to an anomalous result. Were Article 19 to be read to say that a contracting state's law "permits" any service of process method not specifically proscribed by the state, contracting states would be placed in the awkward and difficult position of having to imagine every sort of objectionable or obnoxious mode of service and then expressly prohibiting them under Article 19. This nonsensical result would provide no guidance to litigants and increase disputes over the propriety of service of process under Article 19. It would, in short, defeat the Convention's stated purpose of "improv[ing] the organisation of mutual judicial assistance . . . by simplifying and expediting the procedure." 20 U.S.T. 362, Preamble. Accordingly, Article 19 is appropriately and sensibly read as allowing only those methods of service explicitly sanctioned by the contracting state.[14]

■ Given this construction of Article 19, it is apparent that neither the service of process on Bernachawy, nor the service on Chartouni, was sufficient under the Convention. The Quebec Code of Civil Procedure Section II § 120 provides that "[u]nless specifically otherwise provided, any sheriff or bailiff may make a service anywhere in Quebec." Furthermore, § 122 states that "[i]n any place where, within a radius of 50 kilometres, there is neither sheriff nor bailiff able to act, service may be made by any person of legal age residing within that radius or by registered or certified mail." Thus, because sheriffs or bailiffs were presumably present and able to act in the Montreal area and because, even were this not so, plaintiff's process server did not reside there, plaintiff's decision to employ a private, non-resident individual to serve process was improper under Quebec law with respect to both Bernachawy and Chartouni.[15]

There are further problems under Quebec law with the method of service used by plaintiff's private process server. First, with respect to Bernachawy, it is clear under Canadian law that process properly served on Bernachawy's wife at Bernachawy's home would suffice as service on Bernachawy.[16] This did not occur; putting aside the failure to use a sheriff or bailiff, plaintiff's private process server served Bernachawy's wife prior to 7 a.m. The Quebec Code of Civil Procedure Section II § 141 requires that "no service may be made before seven hours [7 a.m.] or after twenty-two hours [10 p.m.] . . . with-

---

**14.** This interpretation of Article 19 is also consistent with Rule 4(f)(2)(A), Fed.R.Civ.P., which states in pertinent part that if the applicable international agreement allows other means of service, such service shall be effected "in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction."

**15.** Even if Article 19 were read to permit any mode of service not specifically proscribed, plaintiff's service of process on Bernachawy and Chartouni would likely still fail as Quebec law may be said *to prohibit* any person other than bailiffs or sheriffs from serving process,

except in the circumstances found in the Quebec Code of Civil Procedure Section II § 122.

**16.** Section 2.1 of Canada's declaration accompanying the Hague Convention stipulates that Canada's central authority serves process on a defendant who is not found at his residence by leaving a copy of the process with a person "of reasonable age" at the defendant's home. *See* Declaration of Canada *following* Hague Convention, at § A(2.1). Similarly, Quebec Code of Civil Procedure Section II § 1–123 provides that service may be effected at a person's residence by leaving a copy "with a reasonable person residing therein."

out the written permission of the prothonotary ."

Second, it was improper for plaintiff's private process server to attempt service on Chartouni by posting a copy of the complaint on Chartouni's apartment. Quebec law does not provide that posting judicial documents on the door of a residence constitutes valid service. The most likely location for such a provision, Quebec Code of Civil Procedure Section II § 123, contains no language authorizing such service. That statute states in a pertinent part that:

> Service of a writ or of any other written proceeding is made by leaving a copy of the proceeding for the person for whom it is intended. Personal service may be made by handing a copy of the proceeding to him in person, wherever he may be; domiciliary service may be made by leaving the copy at his domicile or ordinary residence, with a reasonable person residing therein.

Quebec Code of Civil Procedure Section II § 1–123. While the section's plain language states that the complaint may be "left" for the person for whom it is intended, the statute further explains that it must be left *with* someone, either the defendant himself or a "reasonable person residing therein." Thus, it is improper under Quebec law to serve process by simply posting a complaint on the door of an individual's residence.

The lesson of the result reached here is that a party seeking to serve process in foreign countries that are signatories to the Hague Convention should make use of the Central Authority designated by that country. This is typically the simplest and most secure mode of service in these circumstances. To effect proper service, plaintiff needed to do no more than to request the Central Authority in Quebec to effect service pursuant to the Convention.

The Central Authority in Quebec would then have employed a sheriff or bailiff to perfect service in accordance with Quebec law.

Because this case is dismissed for lack of proper service of process pursuant to Rule 12(b)(5), Fed.R.Civ.P., it is unnecessary to reach the issue of personal jurisdiction challenged pursuant to Rule 12(b)(2), Fed.R.Civ.P., or the motions to dismiss the common law fraud and RICO claims, pursuant to Rule 12(b)(6), Fed.R.Civ.P.

For the foregoing reasons, defendants' motion to dismiss is granted without prejudice.

An appropriate order will issue.