NARCO AVIONICS, INC.

v.

SPORTSMAN'S MARKET, INC. Win Industries, Ltd., and Jal Data Communications and Systems Co., Ltd.

Civ. A. No. 90–8056.

United States District Court,
E.D. Pennsylvania.

June 23, 1992.

Richard F. McMenamin, Victoria E. Silbey, Morgan, Lewis & Bockius, Philadelphia, Pa., John J. Simkanich, Newtown, Pa., for Narco Avionics, Inc. and Narco Avionics, Inc. pro se, John F. Smith, President.

William J. Lehane, Drinker, Biddle & Reath, Philadelphia, Pa., for Sportsman's Market, Inc.

John J. O'Donnell, Eckert, Seamans, Cherin & Mellott, Philadelphia, Pa., for Win Industries, Ltd.

Steven J. Rocci, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia,

Pa., for Jal Data Communications & Systems Co., Ltd.

## MEMORANDUM

WALDMAN, District Judge.

### I. BACKGROUND

Plaintiff Narco Avionics, Inc. ("Narco") brings this patent infringement action to enforce a patent issued on a portable navigational communications transceiver. The patent, No. 4,843,399, was issued on June 27, 1989. Presently before the court are the motions of WIN and JAL to dismiss for lack of personal jurisdiction. The parties have conducted pertinent discovery regarding the issue of jurisdiction and have had an opportunity for oral argument thereon.

### II. FACTS

Defendant Sportsman's Market, Inc. ("Sporty's"), is an Ohio corporation with its principal place of business in Batavia, Ohio. Sporty's sells a transceiver which is alleged to infringe upon Narco's patent. The product is marketed by Sporty's throughout the United States and abroad under the name "Sporty's A300," with Sporty's label prominently visible on the front of the product. See Shevers Decl., Exh. A; Shevers Dep. of 3/21/91 at 31.

Defendants Win Industries, Ltd. ("WIN") and JAL Data Communications Systems Co., Ltd. ("JAL") are Japanese businesses with principal offices in or near Tokyo. Neither has any office, employee or agent in Pennsylvania; advertises, conducts or is licensed to conduct any business in the Commonwealth; or, has any property or account here. See Yamane Aff., ¶ 3–7; Ichimura Aff., ¶ 10; JAL Supp.Resp. to First Set of Interrog., Nos. 1–2 and 10; WIN Resp. to First Set of Interrog., Nos. 1–2 and 10.

Since September of 1988, JAL has manufactured transceivers in Japan without any identifying markings and has sold them to WIN in Japan. See JAL Resp. to First Set of Interrog. No's. 16, 80, 114; Yamane Aff., ¶ 9. JAL has no relationship with WIN other than that of supplier. JAL Resp. to First Set of Interrog. No. 80; JAL Resp. to Second Set of Interrog., No. 60. It has no knowledge of or control over the subsequent distribution of the transceivers, and has never had any direct contact with Sporty's. See JAL Resp. to First Set of Interrog., No. 88; JAL Resp. to Second Set of Interrog. No. 63.[1] JAL does not know how many transceivers WIN resold to Sporty's or the identity of any American purchasers of the A300. JAL Resp. to First Set of Interrog., No's 65, 73–74.

WIN had no involvement with the design or manufacture of the transceiver. See Ichimura Aff., 2, 6. Since the latter part of 1988, WIN has sold transceivers it buys from JAL to Sporty's which it resells to consumers. See Shevers Decl., ¶ 19; Sporty's Answ., ¶ 51; Shevers Dep. of 3/21/91 at 134–35. At Sporty's request, WIN helped to obtain an FCC license for the transceivers which are otherwise delivered to Sporty's without identification. Ichimura Aff., ¶ 6–7. WIN sells to Sporty's f.o.b. Saitama, Japan. Sporty's is responsible for shipping the product to its place of business in Ohio. Id., ¶ 8. WIN has no control over and no knowledge of where, how or to whom Sporty's distributes the product once it takes possession. Id., ¶ 9; Shevers Dep. of 2/29/92 at 32. WIN does not provide a guarantee to the ultimate purchaser and does not supply Sporty's with an instruction manual or warranty card for the product. Ichimura Aff., ¶ 11.[2]

---

1. Indeed, JAL did not know of Sporty's existence until this litigation. See JAL Resp. to First Set of Interrog., No. 65. Plaintiff has argued that this answer is inconsistent with a statement in the Yamane affidavit, on information and belief, that the transceivers which were sold to WIN in Japan by JAL Data were subsequently sold to Sportsman's Market by WIN. Yamane Aff., ¶ 10. There is no inconsistency. Yamane's affidavit was executed on October 21, 1991, nearly one year after the litigation commenced, by which time JAL obviously learned of Sporty's existence.

2. Other than to ensure that WIN has not contradicted any prior or subsequent representations, a letter from WIN's president dated February 22, 1992 has not been relied upon by the court in any respect. The letter, which will be filed

Sporty's labels the transceivers it receives as the "Sporty's A300". ("Sporty's" is a registered trademark of Sportsman's Market.) *See* Shevers Dep. of 3/21/91 at 39. Neither JAL nor WIN exercise any control over Sporty's distribution. *See* Shevers Dep. of 2/29/92 at 117. Sporty's has sold approximately 15,000 A300s, a "very small percentage" of them to Pennsylvania residents. *See* Shevers Dep. of 3/21/91 at 115, 119. Sporty's produces its own instruction manual for purchasers of the A300. *See* Shevers Dep. of 2/29/92 at 94.

Sporty's provides a three year warranty on the product to purchasers. *Id.* at 54–55; Shevers Decl., Exh. A. Sporty's customers return A300s for repair directly to Sporty's. *See* Shevers Dep. of 2/29/92 at 54. Typically, Sporty's fixes the product on site in Ohio and returns it. *Id.* Sporty's has returned a small number of defective transceivers for repair to WIN. *Id.* at 82. There is no evidence that any A300 from a Pennsylvania customer has ever been returned to WIN. *Id.* at 81–82. WIN has returned a total of 418 transceivers for repair to JAL, none of which had a Sporty's label, FCC number or indeed any identification markings whatsoever. *See* Yamane Aff., ¶ 11; JAL's Supp.Resp. and Supp.Resp. to Pl's. First Set of Interrog., No. 69. JAL has no knowledge how or from whom WIN received these transceivers. JAL Supp.Resp. to First Set. of Interrog., No. 69.

By September of 1989, JAL had become aware of Narco's patent. *See* Tanaka Decl., ¶ 17. In October of 1989, JAL rejected an offer by Narco to distribute the JAL transceiver after JAL concluded that it could design around or otherwise defeat the Narco patent. *See* Tanaka Decl., ¶ 24. The JAL representative who allegedly made the statements in September and October of 1989 relied on by plaintiff regarding these matters vigorously denies having done so. *See* Hayashi Supp. Decl., ¶¶ 4, 6–8. In resolving defendants' motions to dismiss, the court will credit plaintiff's version of the Tanaka–Hayashi conversations.

## III. DISCUSSION

Plaintiff argues that the court may assert personal jurisdiction over the foreign defendants under an aggregate national contacts test, stream of commerce theory or effects test.[3]

### A. Aggregate National Contacts

■ In a patent infringement case, a due process jurisdictional inquiry implicates the fifth amendment. *See Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 293 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981). General principles of "minimum contacts" analysis and "fair play" deriving from diversity cases, however, remain applicable. *DeJames,* 654 F.2d at 283; *Fraley v. Chesapeake & Ohio Railway,* 397 F.2d 1, 4 (3d Cir.1968).

Some courts have suggested that a defendant's aggregate national contacts are relevant under a fifth amendment analysis in a federal question case.[4] *See Go–Video,*

---

herewith, merely rehashes matters asserted by WIN in other submissions.

**3.** Plaintiff also makes a single reference to a conspiracy theory in its brief, but does not further elaborate on the substance or applicability of such a jurisdictional theory. There is some doubt as to whether forum-related conduct of a conspirator may be imputed to a co-conspirator for jurisdictional purposes. *See Karsten Mfg. Corp. v. U.S. Golf Ass'n.,* 728 F.Supp. 1429, 1434 (D.Ariz.1990). *See also Boles v. Vanderbilt Shirt Co.,* 1990 WL 74202 at *2 (E.D.Pa. May 31, 1990) (participation in conspiracy which had effects in forum insufficient). In any event, such a theory is clearly inapplicable in a case such as this where there is no allegation or evidence of a conspiracy, let alone one pursuant to which substantial acts were performed within the forum of which the defendants in question were aware. *See Apple Vacations, Inc. v. Dvornik,* 1991 WL 243561, at *3 (E.D.Pa. Nov. 15, 1991); *In re Arthur Treacher's Franchise Litigation,* 92 F.R.D. 398, 411 (E.D.Pa.1981).

**4.** The Supreme Court has declined to pass upon this theory. *See Omni Capital International v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 102, n. 5, 108 S.Ct. 404, 409 n. 5, 98 L.Ed.2d 415 (1987); *Asahi Metal Industry v. Superior Court,* 480 U.S. 102, 112 n. *, 107 S.Ct. 1026, 1032 n. *, 94 L.Ed.2d 92 (1987) (plurality opinion).

*Inc. v. Akai Electric Company, Inc.*, 885 F.2d 1406, 1414 (9th Cir.1989); *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985); *Johnson Creative Arts v. Wool Masters*, 743 F.2d 947, 950 (1st Cir.1984); *Amtrol, Inc. v. Vent–Rite Valve Corp.*, 646 F.Supp. 1168, 1171–72 (D.Mass.1986).[5]

■ In any event, the authority of a district court to exercise jurisdiction is limited by a defendant's amenability to suit under the Federal Rules of Civil Procedure. As this almost invariably turns on the applicable state long-arm statute, the restrictions imposed upon the states by the fourteenth amendment thereby effectively constrain a federal court even in a nondiversity case. *See DeJames*, 654 F.2d at 284. Even courts appearing to favor an aggregate contacts test recognize this principle and require specific authorization from Congress before they would allow an assertion of jurisdiction premised upon national contacts. *See, e.g., Go–Video Inc.*, 885 F.2d at 1413 (national contacts relevant *where* statute authorizes world-wide service of process); *Johnson Creative Arts*, 743 F.2d at 950 (aggregate national contacts relevant *if* Congress specifically provides for nationwide service of process).

■ Where Congress has not enacted a nationwide service provision, a federal court must rely upon the long-arm statute of the state in which it sits to determine whether jurisdiction may be constitutionally exercised over a defendant. *See Omni Capital International v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 105, 108 S.Ct. 404, 410, 98 L.Ed.2d 415 (1987). Congress has not enacted any service provision applicable to patent infringement actions and this court is thus limited by the constraints imposed by Pennsylvania's long-arm statute.[6] *See Max Daetwyler*, 762 F.2d at 297 ("[I]n the absence of any provision in the

patent laws authorizing nationwide service of process, the district court's power to exercise jurisdiction is limited by Fed. R.Civ.P. 4(e) and the Pennsylvania long-arm statute, whose incorporation by reference, Rule 4(e) requires.").

■ That a defendant may be served under the Hague Convention does not alter this result. The Convention is not a "wholly federal means" of service. *See DeJames*, 654 F.2d at 290. "The treaty merely provides a method for effecting service to be used by a litigant with the requisite authority to serve process." *Id.* "[T]he authority to effect service is found in the state long-arm rule." *Id.*

Accordingly, the court must undertake a traditional fourteenth amendment jurisdictional analysis under Pennsylvania's long-arm statute in this case.

**B. Standard of Law**

■ In deciding a motion to dismiss for lack of personal jurisdiction, the allegations of the complaint are taken as true. After a defendant has raised a jurisdictional defense, however, the plaintiff bears the burden of proving, by affidavits or other competent evidence, sufficient contacts with the forum state to establish personal jurisdiction. *See North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990); *Provident Nat'l Bank v. California Federal Savings and Loan Ass'n*, 819 F.2d 434, 437 (3d Cir.1987); *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 542 (3d Cir.1985). Plaintiff must establish those contacts with reasonable particularity. *See Provident Nat'l Bank*, 819 F.2d at 437 (citing *Gehling*, 773 F.2d at 542).

---

5. The Third Circuit appears to be skeptical about this theory. The Court has suggested that an aggregate national contacts test may be incompatible with the 'fairness' component of the fifth amendment. *See DeJames*, 654 F.2d at 287.

6. Accordingly, the court sustained objections to plaintiff's far reaching discovery requests seeking information about defendants' non forum-

related national contacts. For example, plaintiff sought the names, backgrounds and qualifications of every potential employee, attorney, accountant, consultant or vendor in the United States ever interviewed or recruited by JAL or any subsidiary. *See* Pltf. Second Set Interrog., No. 25.

## C. Specific Jurisdiction (§ 5322)

 Pennsylvania law provides two bases for a court to exercise *in personam* jurisdiction—general jurisdiction or specific jurisdiction. *See* 42 Pa.Cons.Stat.Ann. §§ 5301, 5322. Plaintiff's submission in opposition to the motions to dismiss makes clear that it is pursuing a specific jurisdiction theory. In any event, the court is satisfied that a general jurisdiction theory could not successfully have been advanced.[7]

 Under Pennsylvania's long arm statute, a district court may assert personal jurisdiction over a defendant "to the fullest extent allowed under the Constitution of the United States and may be based on the minimum contact with [the] Commonwealth allowed under the Constitution of the United States." 42 Pa.Cons.Stat. Ann. § 5322(b). Thus, the parameters of jurisdiction under Pennsylvania's long-arm statute are co-extensive with those permitted by the Due Process Clause of the Fourteenth Amendment which requires sufficient minimum contacts with the forum. *See Simkins Corp. v. Gourmet Resources Intern., Inc.*, 601 F.Supp. 1336, 1340–41 (E.D.Pa.1985).

Plaintiff contends that the defendants' distributional arrangement supports an assertion of jurisdiction. JAL designed and manufactured an allegedly infringing transceiver which it sold to WIN in Japan. WIN resold the product in Japan to defendant Sporty's, an independent Ohio distributor. Sporty's transported the transceivers to Ohio and from there later sold some to Pennsylvania residents.

### 1. Stream of Commerce/Purposeful Availment

 Mere foreseeability that a product will enter a forum does not establish minimum contacts. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). "The foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum state. Rather, it is that the defendant's connections with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* A defendant must have "purposefully availed" itself of the privilege of conducting activities in the forum. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). *See also, e.g., Gehling*, 773 F.2d at 541 (defendant must commit some act by which it purposefully avails itself of the privileges of the forum); *Max Daetwyler Corp.*, 762 F.2d at 298–99 (same); *Simkins Corp.*, 601 F.Supp. at 1341 (foreseeability alone insufficient to confer personal jurisdiction); *Emery Corp. v. Century Bancorp., Inc.*, No. 82–1204, slip op. at 5 (E.D.Pa. Dec. 23, 1982) (same; applying principal even to an intentional tort).

In *Max Daetwyler, supra*, a patent case factually quite analogous to the instant case, the Third Circuit discussed the stream of commerce theory at length. So damaging is the majority opinion in *Max Daetwyler* to plaintiff's position that at oral argument its counsel asked the court to decline to rely on it.

In *Max Daetwyler*, defendant Meyer, a West German company, manufactured an allegedly infringing product. An independent distributor was generally responsible for sales of the product in the United States, but did not ship to Pennsylvania. Another independent distributor, Uddeholm, received title to the product in West

---

**7.** Neither Japanese defendant carried on "a continuous and systematic part of its general business within [the] Commonwealth." *See* 42 Pa. Cons.Stat.Ann. § 5301(a)(2)(iii); *Provident National Bank*, 819 F.2d at 437. Neither has ever conducted any business in Pennsylvania; advertised or maintained an office or agent here; owned, leased or rented any property, or held any financial account in the Commonwealth; supplied to anyone in Pennsylvania, or been supplied from Pennsylvania, any goods, compo-

nents for goods, business supplies, articles of manufacture, advertising materials or services of any type. *See* Ichamura Aff., ¶ 10; Yamane Aff., ¶¶ 3–7; WIN's Ans. 1 and 10 to First Set of Interrog.; JAL's Ans. 1–2 and 10 to First Set of Interrog. The only contact whatsoever with this forum was WIN's correspondence to a Pennsylvania firm in 1989, inquiring as to whether it would be interested in distributing a different product. It was not.

Germany and marketed it in Pennsylvania as an "Uddeholm" product.

Relying on what the Court characterized as "an expansive application of the 'stream of commerce' theory," the plaintiff argued that jurisdiction existed because Meyer, through Uddeholm, had participated in a distributive chain and should reasonably have anticipated sales of Meyer products in major markets, including Pennsylvania. The Court rejected the argument, noting that the mere likelihood that a product will enter a forum is not constitutionally adequate. 762 F.2d at 298. Purposeful participation in a distributive chain does not "itself yield jurisdiction in the absence of some indicia of purposeful affiliation with the forum state." 762 F.2d at 300.

Like the product in *Max Daetwyler*, title to the transceivers in the instant case is transferred outside the United States. The manufacturer, JAL, sells the allegedly infringing product to WIN, an independent distributor, in Japan. WIN sells the product to Sporty's f.o.b. Saitama, Japan, and thus Sporty's assumes title in Japan. Like Uddeholm in *Max Daetwyler*, Sporty's is a wholly independent distributor. WIN and JAL have no control over where or how Sporty's sells the transceivers.[8] Like Uddeholm in *Max Daetwyler*, Sporty's advertises and sells the product under its own name.

■ In its brief and oral argument, Narco argues that Third Circuit case law is not binding on this court because the Court of Appeals for the Federal Circuit has appellate jurisdiction in patent matters. Pl.'s Cons.Opp. at 2. It is true that the Federal Circuit has appellate jurisdiction in patent cases. *See* 28 U.S.C. §§ 1292(b)-(c), 1295. The law of the Circuit in which the district court sits, however, controls the resolution of nonpatent issues. *See Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1439 (Fed. Cir.1984) (district courts follow guidance of

their particular circuits in all but substantive law fields assigned exclusively to Federal Circuit). *See also Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 909 (Fed.Cir.1984).

In support of its stream of commerce theory, plaintiff relies on *Horne v. Adolph Coors Co.*, 684 F.2d 255 (3d Cir.1982), cited by the dissent in *Max Daetwyler*. In *Horne*, the facts supporting jurisdiction were more compelling. In *Horne*, the defendant had actual knowledge that its product was being distributed in the forum. More importantly, there was evidence that the product flowed directly into the forum to forum state distributors from defendant's agents or defendant itself. *Horne*, 684 F.2d at 258.[9]

Subsequent to *Max Daetwyler*, the Supreme Court addressed the stream of commerce theory in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi*, a California resident injured in a motorcycle accident in that state alleged that the cause was a defect in a tire and sued the Taiwanese manufacturer and a California retailer in a California state court. The Taiwenese company sought indemnity from Asahi, the Japanese manufacturer of the valve assembly in the tire.

Asahi contested the court's jurisdiction as it never directly placed its product into California. Asahi had no office, agents, employees or property in California; did not advertise or solicit business there; had not created or controlled the distribution system by which its valves were brought into California; and, had not designed its product for the forum state market. *Id.* at 112–13, 107 S.Ct. at 1032. The Court found that the exercise of jurisdiction over Asahi would exceed the limits of due process.

In the plurality opinion, Justice O'Connor specified that the key focus of a jurisdic-

---

**8.** Indeed, the parties in the distribution chain in this case are even more independent than those in *Max Daetwyler*. In that case, there was evidence that Uddeholm would occasionally instruct Meyer to ship the product directly to American customers, although none in Pennsylvania. *See Max Daetwyler*, 762 F.2d at 292.

**9.** The Court in *Horne* had suggested that the purposeful availment test of *World–Wide Volkswagen* might have been abandoned. *See Horne*, 684 F.2d at 259. In light of *Max Daetwyler* and *Asahi*, discussed *infra*, this clearly has not happened.

tional inquiry is the relationship between the defendant, the forum and the litigation. *See Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033. Addressing the stream of commerce rationale, the opinion states:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum State.

*Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032.

■ Thus, a court may not constitutionally exercise jurisdiction in the absence of acts by the defendant purposefully directed toward, or constituting purposeful availment of, the forum state.

Plaintiff argues that the court should not be persuaded by Justice O'Connor's opinion as five justices were "unwilling to put restraints on the 'stream of commerce' theory." Pl.'s Cons.Opp. at 18. Although three opinions were filed in *Asahi,* the plurality opinion is most persuasive for jurisdictional analysis in this circuit. *See Williamson v. Consolidated Rail Corp.,* 712 F.Supp. 48, 52 n. 1 (M.D.Pa.1989) (adopting Justice O'Connor's opinion as most persuasive, noting her agreement with and favorable citation to *Max Daetwyler* ).

■ Alternatively, plaintiff argues that there has been purposeful availment by JAL and WIN. The indicia plaintiff asserts are: (1) JAL and WIN's interest in serving the substantial market for aviation products in the United States, which includes Pennsylvania; (2) participation by JAL and WIN in obtaining an FCC license to facilitate sales of the product in the United States, which includes Pennsylvania; and, (3) provision by WIN and JAL of repair service for the product, which represents "deliberate, intentional, willful action taken to satisfy the ultimate consumer, not only in Pennsylvania, but in every state."

These assertions make clear that plaintiff's jurisdictional argument is premised on aggregate national contacts and not forum related activity. The design by JAL of a product for resale in the United States and defendants' assistance in obtaining an FCC license to facilitate sales by an independent distributor in the United States are not activities purposefully directed toward Pennsylvania and do not constitute an availment of any privilege or benefit provided by the Commonwealth. Almost all of the repair work required for A300's was performed in Ohio by Sporty's. There is no evidence that any of the transceivers repaired by WIN or JAL originated in Pennsylvania.

Plaintiff puts particular emphasis on the presence of a FCC identification which includes the letters "WIN." In minute script, below Sporty's prominent identification label, there appears: "FCC ID: IIBA3DMWIN1." That WIN's initials appear in a FCC identification which it helped to obtain for a transceiver at the request of an independent Ohio distributor to whom WIN sells in Japan simply does not constitute availment of, or activity purposefully directed toward, Pennsylvania.[10]

---

**10.** Plaintiff appears to have an alternative forum in Ohio, at least as to WIN. WIN sent a letter and transceiver to Sporty's in Ohio successfully soliciting future purchase orders. Shevers Dep. of 3/21/91 at 132. WIN's president came to Sporty's in Ohio to collect the first purchase order for the JAL transceivers. *Id.* at 134–35. WIN's president has visited another company in the Southern District of Ohio which WIN regularly supplies with other products. Shevers Decl., ¶ 17–19. WIN has undertaken a continuing series of business obligations between itself and Sporty's which are governed by Ohio law. Sporty's Mot. to Transfer, Exh. B, ¶ 22. *See Burger King Corp. v. Rudzewicz,* 471

Other cases relied upon by plaintiff predate *Max Daetwyler* and *Asahi*, are inconsistent with them or are otherwise distinguishable.

In *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367 (5th Cir.1986), *reh'g denied*, 808 F.2d 1520 (5th Cir.1987), the defendant manufacturer conducted substantial business in the forum, made direct sales of the product in question to citizens of the forum and regularly sent employees into the forum to train users of its products. *Id.* at 1369.

In *Morris v. SSE, Inc.*, 843 F.2d 489 (11th Cir.1988), the defendant manufacturer received from the forum a malfunctioning parachute component which it repaired and returned to the forum. It was the subsequent malfunction of that very component which caused the accident in the forum on which the cause of action was based. *Id.* at 491, 494. It also appeared that the manufacturer had advertised the product in the forum. *Id.* at 494.

In *Mason v. F. LLI Luigi & Franco Dal Maschio Fu G.B. S.N.C.*, 832 F.2d 383, 385 (7th Cir.1987), the foreign defendant specifically designed the product in question for the plaintiff's employer in the forum and sent employees to assist in setting up the product and instructing on its use.

In *Felty v. Conaway Processing Equipment Co.*, 738 F.Supp. 917 (E.D.Pa.1990), the defendant manufacturer kept a list of locations where its machines were installed; closely corresponded and conducted business dealings directly with its American sales representative; directly sold the same machine to a forum customer; and, allowed its agent to advertise the machine for sale in the forum.

Plaintiff incorrectly cites *Lapeire v. Volkswagen AG*, 698 F.Supp. 95 (E.D.Pa. 1988) as a case involving jurisdiction over a foreign defendant. Actually, the Court considered whether jurisdiction over a domestic corporation could be asserted. As the Supreme Court noted in *Asahi*, where a foreign defendant is involved "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033.

In *Lapeire* the Court concluded that it had jurisdiction over a non-forum distributor because it derived benefit from sales made outside the forum to citizens of the forum by nonforum retailers it had supplied, thereby creating additional demand for the distributor's products. Under this approach, any manufacturer or distributor could be haled into the courts of any state in which, or to whose citizens, sales were made by someone below it in the distributive chain, however independent the latter may be. This is difficult to distinguish from a pure stream of commerce theory for which the Court expressed a predilection. *Lapeire*, 698 F.Supp. at 99 (in product liability case "the law should be such as to permit" injured party to sue all in distributive chain in one forum). The Court does not reconcile its approach with *Asahi* or *Max Daetwyler*, and indeed does not mention these cases.

Two other cases cited by plaintiff predate *Asahi* and do not address the need for purposeful availment. In *Muller v. Temura Shipping Co., Ltd.*, 629 F.Supp. 1024 (E.D.Pa.1986), the court found jurisdiction over a foreign stevedoring company, reasoning that because it knew the cargo it had stowed was destined for Pennsylvania, it had an expectation that one unloading a cargo negligently stowed could be injured in Pennsylvania. While the court does not subscribe to the view that foreseeability alone is sufficient to exercise jurisdiction, it notes that neither defendant in the instant case had actual knowledge that their product was specifically destined for Pennsylvania.

In *Allen Organ Co. v. Kawai Musical Instruments Mfg. Co.*, 593 F.Supp. 107 (E.D.Pa.1984), defendant manufacturer extensively monitored sales by its wholly owned American subsidiary. Defendant maintained detailed records by state of the

U.S. 462, 475–76, 482, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985).

destination of all its goods and the amount of sales in each market. It also provided its American subsidiary with service manuals, a training program and advertising manuals.

■ Consistent with *Max Daetwyler, Asahi* and other recent decisions, the court concludes that jurisdiction cannot be premised on a stream of commerce theory absent some deliberate forum-directed conduct by the defendant. *See, e.g., Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir.1992) (that foreign manufacturer could foresee product may enter forum through independent U.S. purchaser-distributor insufficient to support jurisdiction); *Kennedy v. Steelastic West, Inc.,* 1991 WL 208780 (Oct. 7, 1991 E.D.Pa.) (declining jurisdiction over manufacturer which intentionally participated in world-wide distribution chain but did not design, manufacture or market system for particular location); *Soupart v. Houei Kogyo Company, Ltd.,* 770 F.Supp. 282, 284 (W.D.Pa.1991) (declining jurisdiction over Japanese manufacturer which sold product without control over its disposition); *Niklaus v. Vivadent, Inc., U.S.A.,* 750 F.Supp. 693 (M.D.Pa.1990) (declining jurisdiction over German manufacturer and exporter who delivered their product to independent American distributor for sale throughout United States).

### 2. Effects Test

■ Relying principally on *Calder v. Jones* and the dissent in *Max Daetwyler,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), plaintiff alternatively contends that jurisdiction may be asserted over WIN and JAL because they "knew that tortious harm was occurring in every state," never instructed Sporty's "not to market in Pennsylvania" and the acts of infringement had a harmful "effect in Pennsylvania" because plaintiff is headquartered here. Pl.'s Cons. Opp. at 23–24.

In *Calder,* a Californian brought a libel action in a California state court against a national publication, its California distributing company and two individual residents of Florida. One of the individual defendants authored the libelous article and the other, as president and editor, was responsible for all aspects of the operations of the publication. The Court held that the California court had jurisdiction over the two individual defendants.

In *Calder,* the author solicited information from sources in California for use in the article, and thus appears to have had minimum forum contacts related to the subject of the litigation. Further, defendants knew that a substantial percentage of each edition of this publication was circulated in California. Thus, defendants knew that they were respectively writing and editing, as well as overseeing production and distribution of, an article defaming a Californian which was predestined in large part for circulation in California. This the Court concluded constituted intentional activity "expressly aimed at California," and thus defendants "could reasonably anticipate being haled into court there." *Id.* at 789–890, 104 S.Ct. at 1487. It is thus clear that in *Calder* the Court was not departing from the principles espoused in *World–Wide Volkswagen* that a defendant must reasonably anticipate being haled into court in a forum and must have purposefully directed activity thereat.

*Dakota Industries v. Dakota Sportswear, Inc.,* 946 F.2d 1384 (8th Cir.1991), the only intellectual property case cited in which *Calder* was applied, is also distinguishable. In *Dakota,* the defendant, who admittedly knew it was infringing upon a valid trademark, sold the infringing product to retail distributors which it knew resold the product in the forum and there was evidence to suggest that defendant made direct shipments of the infringing product to the forum.

Similarly, the court does not read *Horne* to stand for the proposition that a patent holder can hale into a court in his home state anyone who manufactures or distributes an infringing product anywhere, under a tortious harm theory. If the Court intended to adopt such a rule, it simply could have said so and need not have discussed the placement by defendant and its agents of the infringing product into the forum.

*Calder* did not turn on the mere foreseeability of injury to a citizen of the forum, but rather on the fact that injury was caused by activity intentionally directed by defendants at the plaintiff and his forum. *See Forum Publications, Inc. v. P.T. Publishers, Inc.,* 700 F.Supp. 236, 247 (E.D.Pa. 1988) (rejecting *Calder* theory in case of misrepresentation calculated to injure forum corporation's business circulated in national publication). *See also Clemens v. Schwartzkopf,* 1990 WL 210611, at *5 (Dec. 18, 1990 E.D.Pa.) (*Calder* decision did not overrule *World–Wide Volkswagen* which requires purposeful activity by defendant directed against the forum).

There is an important distinction between intentional activity which foreseeably causes injury in the forum and intentional acts specifically targeted at the forum. *Karsten Mfg. Corp. v. U.S. Golf Ass'n.,* 728 F.Supp. 1429, 1433 (D.Ariz.1990) (no jurisdiction over defendant whose alleged anti-trust violation effectively barred use of product made exclusively by plaintiff in forum.)

There is a critical difference between an intentional act which has an effect in the forum and an act taken for the very purpose of having an effect there. *Lake v. Lake,* 817 F.2d 1416, 1423 (9th Cir.1987) (defendant obtains *ex parte* custody order for purpose of using it in forum to seize child living there). Classic textbook examples would be mailing a letter bomb into the forum to a plaintiff with the intent that he be injured upon opening it, or propelling a projectile across the Delaware River from New Jersey into Pennsylvania for the purpose of hitting and injuring someone in this forum.

■ Courts recognize the interest of a forum state in protecting the intangible property rights of its residents. Presumably, this interest is no greater, however, than a forum state's interest in protecting the physical safety and reputations of its residents. Yet, activity by a defendant implicating these interests does not confer jurisdiction in the absence of purposeful availment or acts by a defendant targeted at the forum. *See, e.g., Gould,* 957 F.2d at 576.

Instructive in this regard is *Hollister, Inc., v. Coloplast A/S,* 16 U.S.P.Q.2d 1718, 1990 WL 141423 (N.D.Ill.1990). In *Hollister,* a patent holder sued in his home forum the foreign manufacturer of infringing products which were distributed throughout the United States exclusively by the defendant manufacturer's wholly owned subsidiary. The distributor sold some of the infringing products to a retailer for resale in the forum. There was no evidence that the manufacturer exercised control over where the subsidiary sold the products. The Court held that in the absence of forum contacts, it could not exercise jurisdiction over the manufacturer without violating principles of due process.

■ In the instant case, the allegedly infringing product was sold to forum residents by an independent U.S. distributor, under its name, with whom the foreign defendants had no corporate relationship and over whom they exercised no control or oversight. Thus, this presents an even less compelling case for the assertion of jurisdiction than *Hollister.* The court does not suggest that a foreign party could not be subject to jurisdiction in a state into which it introduced an infringing product through another party subject to its control or oversight.

To the suggestion of the dissent in *Max Daetwyler* that a tortious injury theory might have been applicable given the tortious nature of plaintiff's patent infringement claim, the majority responded:

> Even the fact that patent infringement may be deemed a tort cannot relieve a plaintiff from establishing that a defendant has sufficient minimum contacts with the forum state. Nor can the designation of patent infringement as a tort automatically satisfy the foreseeability requirement of *World–Wide Volkswagen.*

*Id.* at 299 n. 12.

JAL and WIN did not "expressly aim" or target activity at this forum. JAL's sales in Japan to an independent distributor who determined where and to whom the prod-

ucts were resold without any input from or even knowledge of JAL does not constitute an act by JAL targeted at the forum.

Plaintiff's argument that WIN intentionally directed harmful conduct at Narco and Pennsylvania by favorably comparing its product to plaintiff's in a communication to a distributor of aviation products in the state of Washington also is unavailing. The evidence on which plaintiff relies shows only that WIN solicited this distributor by facsimile for sales in Central and specifications enclosed with the solicitation, WIN compared its product favorably with *all* other handheld transceivers. Lewis Aff., Exh. A. The court cannot conclude that by favorably comparing its product to those of its competitors in soliciting a Washington company to make foreign sales, WIN engaged in conduct expressly aimed at plaintiff and Pennsylvania.

## IV. CONCLUSION

Plaintiff has failed to adduce sufficient forum contacts to establish personal jurisdiction over the two Japanese defendants in this forum under any cognizable legal theory. These defendants neither availed themselves of the privileges and benefits of conducting activities in the forum nor expressly targeted activity at the forum.

Accordingly, the motions to dismiss of these defendants will be granted. Appropriate orders will be entered.

### ORDER

AND NOW, this 23rd day of June, 1992, upon consideration of defendant Jal Data Communications & Systems Co., Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and plaintiff's response thereto and after oral argument thereon, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED and the above case as to defendant Jal Data Communications & Systems Co., Ltd. is DISMISSED.

### ORDER

AND NOW, this 23rd day of June, 1992, upon consideration of defendant Win Industries, Ltd.'s Motion to Dismiss for lack of personal jurisdiction and plaintiff's response thereto and after oral argument thereon, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED and the above case as to defendant Win Industries, Ltd. is DISMISSED.